OPINION OF THE COURT
Duane A. Hart, J.
Plaintiff Barbara Samide commenced this action, inter alia, to recover damages for sex discrimination which allegedly *563 occurred during the course of her employment as principal of St. Elizabeth’s School, a Catholic elementary school located in Queens, New York.
This action was originally commenced on June 19, 2000. Thereafter, by notice of motion dated August 2, 2002, defendants Roman Catholic Diocese of Brooklyn (Diocese), Bishop Thomas V. Daily and Monsignor James Spengler filed a preanswer motion to dismiss the complaint insofar as asserted against them. By notice of motion dated August 23, 2002, defendant Father John Thompson filed a preanswer motion to dismiss the complaint against him. Before the motions to dismiss were decided, the plaintiff served an amended complaint as of right, dated August 22, 2002 (see, CPLR 3211 [f|; see generally, STS Mgt. Dev. v New York State Dept. of Taxation & Fin., 254 AD2d 409). “When an amended complaint has been served, it supersedes the original complaint and becomes the only complaint in the case” (St. Lawrence Explosives Corp. v Law Bros. Contr. Corp., 170 AD2d 957, 957). Thus, the motions to dismiss and strike portions of the original complaint are rendered moot by the service of the amended complaint.
Background
The following facts are taken from the amended verified complaint, dated August 22, 2002:
Defendant Roman Catholic Diocese of Brooklyn is the governing organization of the Catholic Church in Brooklyn and Queens and operates the Catholic school systems in both boroughs through its Office of Superintendent of Schools. Defendant Bishop Thomas Daily (Bishop Daily) is the chief executive of the Brooklyn/Queens Diocese and the president of the Board of Trustees of defendant St. Elizabeth’s Roman Catholic Church. Bishop Daily appointed defendant Monsignor James Spengler (Monsignor Spengler) as the Episcopal Vicar of Queens South to serve as Bishop Daily’s representative to the Queens South area, which includes St. Elizabeth’s Parish and School. Bishop Daily also appointed defendant Father John Thompson (Father Thompson) as Pastor of St. Elizabeth’s Parish and School. Defendant Monsignor Otto Garcia (Monsignor Garcia) is the Vicar General of the Diocese. As such, he is the highest administrator in the Diocese and has executive power over the whole Diocese. Monsignor Garcia was appointed by Bishop Daily and serves at his pleasure. Monsignor Garcia is *564 also trustee of St. Elizabeth’s Roman Catholic Church. Defendant Anthony Danile (Danile) was, at all times relevant to this action, the District Superintendent for the Catholic schools in Queens South. Danile supervised the plaintiff. At all relevant times, Monsignor Spengler, Monsignor Garcia, Danile and Father Thompson were subordinates of Bishop Daily and he had the power to remove them.
In June 2000, Father Thompson hired the plaintiff as principal of St. Elizabeth’s School and was the plaintiff’s immediate supervisor. In or about September 2000, and continuing until his removal from the parish in March 2002, Father Thompson began to barrage the plaintiff with descriptions of his sexual exploits. The plaintiff informed Father Thompson that his conduct toward her was unwelcome but he did not relent.
In October 2000, Father Thompson told the plaintiff that in the late 1980’s, he had been accused of misconduct at another parish in Brooklyn, whereupon he was told by former Bishop Mugavero that he should “go away for a while.” Father Thompson took a leave of absence and taught for several years as Mr. Thompson at Monsignor McClancy High School in Queens. He was subsequently reinstated by Bishop Daily. The plaintiff alleges that since Father Thompson’s leave was occasioned by misconduct, the defendants had prior notice of Father Thompson’s behavior.
On or about October 24, 2000, the plaintiff was invited by Father Thompson to a Futures in Education Dinner in Manhattan as part of her employment. After the dinner, the plaintiff offered to drive Father Thompson home to the rectory. Father Thompson said he wasn’t going to the rectory but was staying in Manhattan overnight and could use a ride downtown. Father Thompson then directed the plaintiff to The Lure, a bar in Greenwich Village, which Thompson described as an “S&M” club. Father Thompson took off his collar and left with an overnight bag stating that it was “defenders night” at The Lure. Father Thompson later told the plaintiff that he was a member of “Defenders New York,” a Catholic gay leather organization that regularly met at The Lure.
Father Thompson insisted that the plaintiff accompany him to bars where he said he went for sex. In one instance, Father Thompson asked the plaintiff to accompany him to a bar under the premise of taking her to a business dinner. He told the plaintiff that he was free to engage in sex whenever he wanted because half the priests in the Diocese were doing the same thing.
*565 Father Thompson regularly talked about sex to the plaintiff. He told the plaintiff that he detested the female form and that the only thing that women were good for was oral sex. He talked about oral sex in the most vulgar manner and described the plaintiff as wanting it from him. The plaintiff repeatedly asked Father Thompson to stop talking to her of these matters, but he refused.
On another occasion, after Father Thompson brought a young man to live in the rectory of the parish, Father Thompson told the plaintiff that he was the young man’s “sugar daddy” and that the young man was his “houseboy,” whom he paid for sex. When the young man threatened to expose Father Thompson’s sexual activities to the Diocese, Father Thompson directed the plaintiff to pay the young man by check from school funds. Father Thompson threatened to fire the plaintiff if she did not comply.
Father Thompson also struck and physically abused the plaintiff on numerous occasions. This conduct continued with greater intensity after the plaintiff changed the lock on the closet door in her office to prevent Father Thompson from continually removing cash from the safe in the school office. Father Thompson repeatedly warned the plaintiff that he could fire her at any time and would make sure that she never got another job in the Diocese.
Throughout the subject period, the plaintiff repeatedly reported Thompson’s conduct to Monsignor Spengler, Danile and to the school’s Office of the Diocese. Monsignor Spengler made eight visits to St. Elizabeth’s School during the period in question and presented himself to the plaintiff as the person to whom she should direct her complaints about Father Thompson. The plaintiff called Monsignor Spengler at his rectory to request his assistance. Monsignor Spengler, Danile and others at the Diocese’s School’s Office admitted to the plaintiff that Father Thompson was a serious problem but told her to “stick it out.”
On November 19, 2001, an official from the Diocese told the plaintiff that Father Thompson “is so sick at this point that he is no longer responsible for his acts” but nothing was done to stop Father Thompson from harassing the plaintiff.
On December 6, 2001, the plaintiff asked a student’s parent why his child’s tuition had not been paid and the parent insisted that the money had been paid in cash to Father Thompson. That evening, Father Thompson went to the school’s office in a rage because the plaintiff had questioned the *566 parent. The plaintiff asked the young man why the tuition for his child was not paid. When the plaintiff asked Father Thompson whether the tuition money was going to Jonathan, the young man living in the rectory, Father Thompson responded, “Jonathan gives me what you want to do to me. He sucks my cock.”
In response to the plaintiff’s subsequent pleas to Monsignor Spengler to prevent Father Thompson from continuing to abuse and harass her, Monsignor Spengler advised the plaintiff not to quit as principal because it would not be good for another principal to walk out. He told her not to discuss Father Thompson’s conduct or the presence of his “houseboy” in the rectory. When the plaintiff told Monsignor Spengler that she could no longer take the harassment and abuse, he told her that although she was being abused and harassed, her contract required her to stay for a year.
In March 2002, Father Thompson went to the plaintiff’s office angry when she asked him for a copy of the school’s audit. In response, he took a copy of a pornographic magazine and handed it to her saying, “Here’s what you wanted.” When the plaintiff called the Diocese’s School’s Office, she was told that Monsignor Spengler would take care of everything.
On March 13, 2002, Monsignor Spengler told the plaintiff that “she must not talk to anyone about the kid living in the rectory. That’s [Father Thompson’s] personal life, it is his problem.” He also said he didn’t want to know the names of the other priests that Father Thompson had stated were sexually active. Monsignor Spengler and Danile expressed no interest in correcting the sexual harassment being committed by Father Thompson. The plaintiff asked the Diocese to release her from her contract so that she would no longer have to work with Father Thompson and it refused. When the plaintiff asked the Diocese to remove Thompson from his post as Pastor, it refused again.
On March 19, 2002, Monsignor Spengler told the plaintiff that Thompson would be staying on until the end of June 2002. On March 20, 2002, the plaintiff met with Monsignor Guy Puglisi and told him all of the facts relating to Father Thompson. Monsignor Guy Puglisi told the plaintiff that he would go with her to the District Attorney’s office if the Diocese didn’t act promptly. He then called Monsignor Garcia to advise him of Father Thompson’s conduct. On March 21, 2002, Monsignor Garcia called the plaintiff at home. Monsignor Garcia indicated in the conversation that he was aware of Father *567 Thompson’s behavior. He was removed as Pastor on March 24, 2002.
Based upon the foregoing allegations, the first cause of action of the amended complaint asserts a form of sex discrimination commonly referred to as sexual harassment. A claim of sexual harassment may be brought under two theories: (1) hostile work environment discrimination, and (2) quid pro quo discrimination in violation of the New York State Human Rights Law, Executive Law § 296. The amended complaint alleges both theories. The amended complaint also alleges causes of action for negligence on vicarious liability grounds, intentional infliction of emotional distress, breach of contract, negligent supervision and civil assault and battery.
Defendants Roman Catholic Diocese of Brooklyn, Bishop Daily, Monsignor James Spengler, Monsignor Otto Garcia, Anthony Danile and St. Elizabeth’s Roman Catholic Church move to dismiss the plaintiffs amended complaint against them pursuant to CPLR 3211 (a) (7), (8) and (11).
It is well settled that in considering a motion to dismiss pursuant to CPLR 3211 (a) (7), the pleading is to be afforded liberal construction, and the allegations in the complaint are accepted as true (see, Leon v Martinez, 84 NY2d 83, 87-88; Wiener v Lazara Freres & Co., 241 AD2d 114, 120). The criterion is whether the proponent of the pleading has a cause of action (see, Guggenheimer v Ginzburg, 43 NY2d 268). Generally, such a determination can be made from the factual allegations in the four corners of the complaint (Guggenheimer v Ginzburg, 43 NY2d 268, supra at 275). “Evidentiary material may be considered to remedy the defects in the complaint” (Kenneth R. v Roman Catholic Diocese, 229 AD2d 159, 162 [internal quotation marks omitted]; see, Rovello v Orofino Realty Co., 40 NY2d 633).
Defendants Diocese, Monsignor Spengler and Danile move to dismiss the first cause of action for sex discrimination asserted against them in the plaintiffs amended complaint, pursuant to CPLR 3211 (a) (7), on the ground that they are not the plaintiffs employer.
Pursuant to New York State’s Human Rights Law, it is unlawful “[f]or an employer * * * because of the * * * sex * * * of any individual * * * to discriminate against such individual in compensation or in terms, conditions or privileges of employment” (Executive Law § 296 [1] [a]). The plaintiff does not dispute that the New York State Human Rights Law only applies to employers (see, Executive Law § 296 [1] [a]). *568 However, she alleges that each of the defendants are employers within the meaning of the New York State Human Rights Law.
Although the plaintiffs employment contract refers to defendant St. Elizabeth’s Parish as the plaintiffs employer, the amended complaint alleges that she is employed by both the Parish and Diocese, as the governing body of the Parish. This claim is bolstered by (1) the certificate of incorporation of defendant Roman Catholic Diocese of Brooklyn, dated June 13, 1899 (annexed as exhibit B to defendant’s motion to dismiss the complaint), which indicates that defendant Diocese comprises Kings, Queens, Nassau and Suffolk Counties and that the Roman Catholic Bishop of such Diocese and his Board of Diocesan Consultors possess ecclesiastical jurisdiction over the Roman Catholic Churches and societies within these counties; (2) the unrefuted allegation that defendant Diocese operates the Catholic schools in these counties through its Office of Superintendent of Schools, including defendant St. Elizabeth’s Parish and School, where the plaintiff worked; and (3) that the plaintiffs employment is subject to the principal personnel handbook distributed by the Diocese’s Office of the Superintendent of Schools (annexed as exhibit C to defendants’ affidavit in opposition to amend complaint). The court finds that this evidence, inter alia, sufficiently establishes that the Diocese is an employer of the plaintiff within the meaning of the Human Rights Law. Thus, the defendants’ attempt to dismiss the amended complaint against defendant Diocese on the ground that it is not the plaintiffs employer is rejected.
The defendants also contend that defendant Monsignor Spengler is not an employer within the meaning of the Human Rights Law because he has no ownership interest or control over the Diocese or St. Elizabeth’s Parish. However, as a corporate employee he may be subject to an employment discrimination suit under the Human Rights Law if he has the authority “to do more than carry out personnel decisions made by others” (Patrowich v Chemical Bank, 63 NY2d 541, 542). According to the allegations of the plaintiffs complaint, defendant Monsignor Spengler was, at all relevant times, the Episcopal Vicar of Queens South. As such, he was defendant Bishop Daily’s representative to the area, which included defendant St. Elizabeth’s Parish and School, and was responsible for pastoral life in Queens South. He was appointed by and serves at the pleasure of defendant Bishop Daily, the chief executive of the Diocese and the president of the Board of Trustees of St. *569 Elizabeth’s Parish. As previously indicated, the plaintiff alleged that defendant Monsignor Spengler made eight visits to St. Elizabeth’s School during the period in issue and presented himself to her as the person to whom she should direct her complaints about Father Thompson. The plaintiff also alleges that when she pleaded with Monsignor Spengler to prevent Father Thompson from continuing to harass her, Monsignor Spengler often told her to hang in there and not to quit. In March 2002, when the plaintiff called the Diocese School’s Office to complain about Father Thompson’s conduct, she was told that Monsignor Spengler would take care of everything. Sometime thereafter, he directed the plaintiff not to speak to anyone about Father Thompson’s conduct. He told her that she would not work again for the Diocese or anywhere in the Church unless she completed the term of her contract and remained silent about Father Thompson’s conduct. Accepting the allegations of the amended complaint as true, the plaintiff’s pleadings sufficiently establish that Monsignor Spengler has the power to do more than carry out the personnel decisions made by others in the Diocese and St. Elizabeth’s Parish. Therefore, the request to dismiss the amended complaint against Monsignor Spengler on the grounds that he may not be held liable under the Human Rights Law is denied.
The defendants also assert that defendant Anthony Danile cannot be held liable under the Human Rights Law because he had no control over the appointment or removal of pastors and had no power over principals such as plaintiff. According to the allegations in the plaintiff’s amended complaint, Danile was the Diocese’s District Superintendent for the Catholic Schools in Queens South where the plaintiff worked and supervised the plaintiff during the course of her employment as principal of St. Elizabeth’s School. The plaintiff allegedly complained to Danile on numerous occasions regarding Father Thompson’s behavior and treatment of her. However, Danile and the other defendants allegedly failed and/or refused to protect the plaintiff from Father Thompson’s sexual harassment. Instead, Danile and the other defendants permitted him to remain in his position as Pastor of St. Elizabeth’s Parish and School and recommended that the plaintiff put up with the harassment and keep quiet about it or be fired. Notwithstanding the defendants’ claims to the contrary, the court finds that the plaintiff sufficiently alleged that Danile was an employee of the Diocese who also had the authority “to do more than carry out the personnel decisions made by others” (Patrowich v Chemical *570 Bank, 63 NY2d 541, 542). Defendant Danile may be subject to liability under the Human Rights Law.
The defendants also seek dismissal of the plaintiffs complaint against Bishop Daily, Monsignor Spengler and Anthony Danile, the District Superintendent for the Office of Catholic Schools and Monsignor Garcia, pursuant to CPLR 3211 (a) (11), on the ground that they are immune from liability pursuant to section 720-a of the Not-For-Profit Corporation Law. This claim must also be rejected.
CPLR 3211 (a) (11) states, in relevant part, the following:
“(a) * * * A party may move for judgment dismissing one or more causes of action asserted against him on the ground that: * * *
“11. the party is immune from liability pursuant to section seven hundred twenty-a of the not-for-profit corporation law. Presumptive evidence of the status of the corporation, association, organization or trust under section 501(c)(3) of the internal revenue code may consist of production of a letter from the United States internal revenue service reciting such determination on a preliminary or final basis or production of an official publication of the internal revenue service listing the corporation, association, organization or trust as an organization described in such section, and presumptive evidence of uncompensated status of the defendant may consist of an affidavit of the chief financial officer of the corporation, association, organization or trust. On a motion by a defendant based upon this paragraph the court shall determine whether such defendant is entitled to the benefit of section seven hundred twenty-a of the not-for-profit corporation law or subdivision six of section 20.09 of the arts and cultural affairs law and, if it so finds, whether there is a reasonable probability that the specific conduct of such defendant alleged constitutes gross negligence or was intended to cause the resulting harm. If the court finds that the defendant is entitled to the benefits of that section and does not find reasonable probability of gross negligence or intentional harm, it shall dismiss the cause of action as to such defendant.”
Not-For-Profit Corporation Law § 720-a provides, in relevant part, as follows:
“no person serving without compensation as a *571 director, officer or trustee of a corporation, association, organization or trust described in section 501(c)(3) of the United States internal revenue code shall be liable to any person other than such corporation, association, organization or trust based solely on his or her conduct in the execution of such office unless the conduct of such director, officer or trustee with respect to the person asserting liability constituted gross negligence.”
Under certain circumstances, some of the moving defendants may be entitled to the benefits of Not-For-Profit Corporation Law § 720-a by virtue of their status as trustees in the defendant Diocese and St. Elizabeth’s Parish. However, under the circumstances presented, the court finds that there is a reasonable probability that the specific conduct of these defendants alleged in the amended complaint constitutes gross negligence including, but not limited to, the allegations that Bishop Daily and the other individual defendants repeatedly received actual notice of Father Thompson’s continued course of sexual conduct and abuse of the plaintiff; that defendant Bishop Daily had reinstated Father Thompson to St. Elizabeth’s Parish after a previous suspension for misconduct from another parish in Brooklyn; that the plaintiff’s request that Father Thompson be removed as Pastor of St. Elizabeth’s Parish and School was repeatedly rejected; that the defendants permitted Father Thompson to remain in his position as Pastor of St. Elizabeth’s Parish and School after admitting that they were aware of his behavior; that the defendants recommended that the plaintiff put up with Father Thompson’s conduct; and that the defendants told her she should keep quiet about Father Thompson’s behavior or be fired. In light of these allegations, the defendants lose the qualified immunity granted by Not-For-Profit Corporation Law § 720-a. Accordingly, the request to dismiss the amended complaint pursuant to CPLR 3211 (a) (11) is denied.
Contrary to the defendants’ further contention, the amended complaint clearly states a claim for both hostile work environment sexual harassment and quid pro quo sexual harassment. In analyzing these claims, “New York courts have often relied upon federal law for guidance in the development of its Human Rights Law” (Nacinovich v Tullett & Tokoyo Forex, Inc., 1998 WL 1050971, *3 [Sup Ct, NY County, May 18, 1998]; see, Matter of Miller Brewing Co. v State Div. of Human Rights, 66 NY2d 937).
In order to state a claim for hostile work environment sexual harassment, the complaint must assert “(1) that [the plaintiff] *572 is a member of a protected class; (2) that the conduct or words upon which her claim of sexual harassment is predicated were unwelcome; (3) that the conduct or words were prompted simply because of her gender; (4) that the conduct or words created a hostile work environment which affected a term, condition or privilege of her employment; and (5) that the defendant is liable for such conduct” (see, Griffin v William M. Mercer, Inc., 1998 WL 1050968, *5 [Sup Ct, NY County, Mar. 25, 1998]; see also, Trotta v Mobil Oil Corp., 788 F Supp 1336 [SID NY 1992]). The complaint must allege conduct severe or pervasive enough to create a work environment that a reasonable person would find hostile or abusive, and it must allege that the victim subjectively perceived the environment to be hostile (see, Harris v Forklift Sys., 510 US 17, 21-22; Trotta v Mobil Oil Corp., 788 F Supp 1336 [SD NY 1992]). It must either indicate that a “single incident was extraordinarily severe,” or that a series of incidents were “sufficiently continuous and concerted” to have altered the conditions of her working environment. Generally, the harassing conduct must be sufficiently “severe” or “pervasive” that it changes the condition of the victim’s employment (Socci v China Grill, 2001 NY Slip Op 50080 [U]). A hostile work environment sexual harassment claim can be established where, as here, there is a showing of a workplace “permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment” (Socci v China Grill, 2001 NY Slip Op 50080[U], supra, quoting Harris v Forklift Sys., Inc., 510 US 17, 21; see, Nacinovich v Tullett & Tokoyo Forex, Inc., 1998 WL 1050971, supra; Father Belle Community Ctr. v State Div. of Human Rights, 221 AD2d 44). In this case, the plaintiff sufficiently alleged that the conduct alleged was unwelcome and that she made numerous complaints to the Diocese regarding Father Thompson’s conduct, but was essentially told that they are aware of what is happening and to accept it. She became anxious, despondent and depressed, notwithstanding what allegedly transpired. The Diocese did nothing to discipline Father Thompson for an extended period of time.
To state a claim of quid pro quo sexual harassment, a plaintiff must establish that “she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as a basis for decisions affecting the compensation, terms, conditions or privileges of her employment” (Karibian v Columbia Univ., 14 F3d 773, 777). The allegations of the amended complaint are more than adequate to sustain this claim.
*573 To state a cause of action for sexual harassment on vicarious liability grounds, a plaintiff must plead that the employer had knowledge of and acquiesced in the discriminatory conduct of its employee or subsequently condoned it (see, Spoon v American Agriculturalist, 120 AD2d 857, 858). “Condonation * * * contemplates a knowing, after-the-fact forgiveness or acceptance of an offense. An employer’s calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation” (Matter of State Div. of Human Rights v St. Elizabeth’s Hosp., 66 NY2d 684, 687). The allegations that the defendants were repeatedly informed of Father Thompson’s conduct, that the defendants asked the plaintiff to put up with the defendant’s behavior and keep quiet about it, that the defendant Diocese allegedly admitted to the plaintiff in November 2001 that Father Thompson is “so sick at this point that he is no longer responsible for his acts” and that the defendants failed to take corrective action against Father Thompson for a period of several months thereafter are sufficient to assert a cause of action for sexual harassment against the defendant employers on vicarious liability grounds based upon their apparent condonation of Father Thompson’s conduct.
Accordingly, the defendants’ request to dismiss the first and second causes of action for sex discrimination and vicarious liability, respectively, is denied.
The fourth cause of action is for breach of contract. To withstand a motion to dismiss a breach of contract claim on sufficiency grounds, a plaintiff must allege an agreement, a breach of the agreement and damages (see, Gelbman v Valleycrest Prods., 189 Misc 2d 403). Where there is no contractual obligation between two parties, there can be no breach of contract claim (see, Fleissler v Bayroff, 266 AD2d 34, 34-35). The defendants’ request to dismiss the fourth cause of action for breach of contract is granted only as against defendants Bishop Daily, Monsignor Spengler, Monsignor Garcia and Anthony Danile because they were not parties to the plaintiff’s employment contract.
That branch of the defendants’ motion which seeks to dismiss the breach of contract claim as against defendants Roman Catholic Diocese of Brooklyn and St. Elizabeth’s Parish is denied.
It is undisputed that the plaintiffs employment as principal with St. Elizabeth’s School is subject to an employment contract effective August 15, 2002 through August 14, 2003. *574 Although defendant St. Elizabeth’s Parish Corporation is a signatory to the agreement, as “the employer,” the agreement is governed by defendant Diocese’s Office of the Superintendent of Schools. Contrary to the defendants’ contention, both of these defendants are parties to the contract with St. Elizabeth’s School acting on behalf of the Diocese. Regarding the element of breach of the agreement, the plaintiff alleges that the defendants breached their covenant of good faith and fair dealing. “Implied in every contract is a covenant of good faith and fair dealing * * * which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement” (Jaffe v Paramount Communications, 222 AD2d 17, 22-23 [citations omitted]; see, Gordon v Nationwide Mut. Ins. Co., 30 NY2d 427, 437; see also, Fourth Branch Assoc. Mechanicville v Niagara Mohawk Power Corp., 235 AD2d 962). The plaintiffs allegations, inter alia, that the defendants imposed undue burdens on the performance of her duties under the employment agreement by insisting that she put up with Father Thompson’s alleged sexual harassment and physically abusive conduct and threatened to fire her for complaining about sexual harassment in the workplace sufficiently pleads breach of the implied covenant of good faith and fair dealing on the part of the defendants Diocese of Brooklyn and St. Elizabeth’s Roman Catholic Church. The plaintiff has also sufficiently pleaded the element of damages.
The defendants’ request to dismiss the third and sixth causes of action against them for intentional infliction of emotional distress and civil assault and battery is granted. These claims cannot serve as a basis for holding the employer vicariously liable for the intentional torts of Father Thompson (see, Griffin v William M. Mercer, Inc., 1998 WL 1050968, *9-10, supra).
However, in instances where an employer cannot be held vicariously liable for its employee’s torts, “the employer can still be held liable under theories of [negligent retention and supervision if] the employer knew or should have known of the employee’s propensity for the conduct which caused the injury” (Kenneth R. v Roman Catholic Diocese of Brooklyn, 229 AD2d 159, 161 [citations omitted]). The plaintiffs amended complaint alleges that the defendants “knew of defendant Thompson’s abusive and harassing conduct toward plaintiff,” that “Thompson had a big history of misconduct and was previously suspended from Parish duties as a result thereof,” and “by *575 ignoring plaintiffs complaints and the many complaints of others made prior to and during plaintiffs employment, defendants negligently retained and/or failed to supervise the actions of Thompson.” Assuming that these allegations are true, as the court must on a motion to dismiss pursuant to CPLR 3211 (a) (7), the plaintiff can state a claim for negligent supervision and retention (see, Heenan v Roman Catholic Diocese of Rockville Ctr., 158 AD2d 587). Accordingly, the defendants’ request to dismiss the fifth cause of action for negligent supervision and retention is also denied.
Lastly, the plaintiffs motion to amend the amended complaint to assert additional causes of action for retaliation and disability discrimination and to add the person who allegedly fired her as an additional party must be denied. Although leave to amend a pleading shall generally be freely given, “[t]he courts may examine the sufficiency of the [proposed] pleadings on a motion to amend to determine if a claim is patently deficient and decide the issue as a threshold matter” (World Trade Knitting Mills v Lido Knitting Mills, 154 AD2d 99; see, Sharapata v Town of Islip, 82 AD2d 350).
The plaintiffs proposed amended complaint would have added a seventh and eighth cause against the defendants, inter alia:
“as and for a seventh cause of action
“(retaliation)
“Plaintiff has served as principal of St. Elizabeth’s School since August 2000. As is hereinabove set forth, Plaintiff repeatedly told defendants of Thompson’s egregious conduct, including his sexual abuse and harassment of her. Defendants repeatedly refused to take any action to prevent Thompson from harassing and abusing Plaintiff, threatening that if she made her allegations against Thompson public, it would lead to her termination as principal of St. Elizabeth’s School * * *
“Plaintiff filed a complaint seeking relief for Thompson’s sexual harassment and abuse * * * “Thereafter, defendants terminated Plaintiffs employment in retaliation for commencing the suit ^ ^ ^
“Such retaliatory discharge violates New York State Human Rights Law Section 296(l)(e) and *576 caused Plaintiff grave injury to her person, property and employment and emotional distress * * *
“as and for an eighth cause of action
“(disability discrimination)
“Plaintiff is suffering from post-traumatic stress disorder as a consequence of defendant Thompson’s sexual abuse and harassment which impaired her ability to perform her duties as principal so long as she was located at St. Elizabeth’s School where the traumatic incidents had occurred. However, she was fully able to serve as principal or to assist another principal in another school in the Diocese or to work in another administrative capacity elsewhere in the Diocese * * *
“Post-traumatic stress disorder is disability within the meaning of the Human Rights Law 296 * * * “Plaintiff requested a transfer to another location as an accommodation to her disability * * *
“Defendants refused to consider her request for an accommodation or to consider what other accommodation might be made that would ameliorate theL effects of the PTSD. Instead, defendants took actions which made it impossible for her to perform the functions of her job, thereby greatly aggravating and exacerbating her symptoms of PTSD * * * “Defendants’ conduct violated the prohibition of the Human Rights Law against discrimination on the basis of disability causing Plaintiff grave injury to her person and property and emotional distress * * * ”
While the plaintiff’s proposed pleading asserts claims for relief arising out of an alleged termination of employment, the plaintiff’s affidavit in support of the motion and other evidence submitted herein, indicate that the plaintiff was not terminated but was placed on a requested leave of absence. Since the claims upon which the proposed amendments are grounded are contradicted by the plaintiffs affidavit and other evidence, leave to amend is denied (see, World Trade Knitting Mills v Lido Knitting, supra).
The defendants’ claim for dismissal of the plaintiffs complaint as against defendants Monsignor Otto Garcia, Anthony Danile and St. Elizabeth’s Roman Catholic Church *577 pursuant to CPLR 3211 (a) (8) for lack of jurisdiction on the ground that the plaintiff improperly added the aforementioned parties as additional defendants without leave of court has been withdrawn.*
The motions are in all other respects denied.

 The defendants withdrew this claim in their reply affirmation, dated October 9, 2002.