OPINION OF THE COURT
Bernard J. Graham, J.
A motion to dismiss has been brought pursuant to CPLR 3211 (a) (1) and (7) by various defendants in this captioned matter. The dismissal motion is brought on behalf of defendants The Weinstein Company, JustJenn Productions, VH1, Marrow Media Company, Viacom Media Networks (which is named “Music & Logo Group Viacom Inc.” in the caption), Electus and Left/ Right, Inc. (hereinafter the corporate defendants) who are involved in the production of the reality television series “Mob Wives.”
The plaintiff, Andrew M. Klapper, M.D. (Dr. Klapper), is a plastic surgeon who has brought the underlying case against the producers of Mob Wives (i.e., the corporate defendants) as well as individual defendants, Renee Graziano and Debra Rossi. The instant motion to dismiss is applicable to the corporate defendants only.
Plaintiff, by his attorneys, has opposed the motion to dismiss and has submitted a memorandum of law and a supplemental memorandum of law in opposition to the motion.
The underlying action was filed by the plaintiff by service of an amended verified complaint dated September 13, 2012. A stipulation was entered into by the respective counsel extending the defendants’ time to answer and allow for a briefing schedule related to this motion.
Argument was heard on the motion in Part 36 of this court before the undersigned on February 14, 2013.
*403 Background
Mob Wives is described as a popular reality show which has been shown on the VH1 network for two seasons. Mob Wives is produced as a “work-for-hire” pursuant to a contractual agreement with defendants The Weinstein Company and Electus. The Weinstein Company and Electus, who are the owners of all rights in Mob Wives, have conveyed joint ownership of the show to defendants Viacom Media Networks and VH1. JustJenn and Marrow Media are described as television production companies which assist with the production of Mob Wives. The defendants, referred to as the corporate defendants for the purposes of this motion, act collectively as the producers and owners of the show.
The premise of the show involves the lives of its main participants, Renee Graziano, Drita D’Avanzo, Carla Facciolo and Karen Gravano and their social and personal interactions. Renee Graziano is said to be the daughter of a convicted member of the Bonnano crime family and it is her statements relative to the plastic surgery that form the basis for the underlying lawsuit.
The relevant facts for the purposes of this proceeding involve the appearance of the plaintiff, Dr. Klapper, on the initial episodes of the second season of Mob Wives. Dr. Klapper is a board certified plastic surgeon who is licensed to practice medicine in New York State and he performed a “full body lift” procedure on Ms. Graziano. The procedure is a complex plastic surgery which is designed to remove fat and sagging skin from various parts of the body.
The decision by Ms. Graziano to have the plastic surgery was incorporated into the story arc of the Mob Wives program. Toward that end, Dr. Klapper, who would perform the surgery, consented to appear on camera performing the procedure. As a condition of his appearance, he was required to sign an appearance release and location agreement. The procedure was performed on June 27, 2011 by Dr. Klapper and was filmed in his office.
Ms. Graziano’s procedure allegedly developed complications after Dr. Klapper removed a tattoo on Ms. Graziano’s lower back and the skin was not able to be closed. Dr. Klapper ordered the cameras to be removed from the operating area. There is a dispute as to the events that occurred after the cameras were removed, with the defendants alleging that Ms. Graziano was bleeding and required emergency treatment at Staten Island Hospital. Plaintiff denies that there was any medical error involved.
*404 The subject of Ms. Graziano’s plastic surgery then became a part of the story line and was discussed by Ms. Graziano and her costars in episodes 201, 202 and 203 which are the first three episodes of the second season. Ms. Graziano, who is an outspoken character on the show, claims that she “flat-lined” and “almost died” which was repeated several times on the show. She also refers to the experience as a “plastic surgery nightmare.”
The surgery incident was reported in various online news reports which quoted Ms. Graziano who described a “near death experience” and claims to have lost six pints of blood. Ms. Graziano also appeared on radio and television programs discussing her surgery procedure and repeated the claims of medical negligence.[1]
Plaintiff alleges that the corporate defendants, by their employees, publicized the “knowingly false” statements to the various media outlets in a campaign to promote the show.
Dr. Klapper has sued for defamation against all defendants (fifth cause of action of the amended verified complaint). The case is premised upon the statements of Ms. Graziano and the republication of the statements of Ms. Graziano in connection with the publicity and advertising for the Mob Wives program by the corporate defendants. In addition, Dr. Klapper’s complaint includes a cause of action for slander per se (sixth cause of action) and libel per se (seventh cause of action). The complaint also includes a cause of action for tortious interference with existing contracts and business relations (first cause of action) and tortious interference with prospective business relationships and economic advantage (second cause of action) (see amended verified complaint, annexed to motion to dismiss as exhibit 1).
The plaintiff has also included a cause of action against Ms. Graziano alone for filing a false complaint with the New York State Office of Professional Medical Conduct (plaintiffs third cause of action). A separate cause of action has been filed against Debra Rossi, who had been employed by Dr. Klapper, who alleg *405 edly made statements related to the death of a patient of Dr. Klapper following surgery in a separate incident (plaintiff’s fourth cause of action). Neither of these causes of action is relevant to the instant motion by the corporate defendants.
Issues Presented
It is the contention of the defendants that the participation of Dr. Klapper in the Mob Wives television show was conditioned upon a valid and binding release (the appearance release) which specifically and unequivocally bars Dr. Klapper from suing Left/ Right, Inc., the production company who produced the show, as well as any and all affiliates, assigns and subsidiaries involved with Mob Wives’s production. According to the attorneys for defendants, each of the corporate defendants is protected under the terms of the appearance release. Furthermore, the appearance release includes a provision that the plaintiff would be responsible for the defendants’ legal fees incurred in defending this case.
In opposition to the motion to dismiss, plaintiffs attorneys have crafted two separate arguments. First, plaintiff argues that only defendant Left/Right, Inc. is a party to the appearance release and New York law would not recognize the other defendants as covered by the terms of the release. According to plaintiff, the defendants who are not a party to the release cannot be considered “affiliates” of Left/Right, Inc., and are, hence, subject to liability in this action.
The other prong of plaintiffs argument is that New York does not permit parties to exempt themselves from the consequences of their own tortious acts in the future. Furthermore, the release would be unenforceable because it lacks specificity by failing to identify the type of conduct for which it is intended to hold the corporate defendants harmless.
Discussion
The relatively recent phenomenon of reality television has created a unique form of entertainment. Seemingly wildly popular, this genre offers opportunities for embarrassing and insulting participants and the more outlandish the conduct, the higher the ratings. There does not seem to be a bottom to the viewing public’s appetite for this brand of entertainment.[2]
Because of the nature of this type of entertainment it appears obvious that the participants would be required to submit a *406 release as a condition of appearing on a reality television show. The potential for lawsuits is tremendous given the nature of the unpredictable story lines and freewheeling exchanges. The instant case includes a rather complete release (the appearance release) which is intended to serve as a level of protection to the producers and owners of the Mob Wives show (see appearance release, annexed to motion to dismiss as exhibit 4).
The appearance release was signed by Dr. Klapper on January 8, 2011 and was a condition of his appearing on the show. The appearance release specifically refers to the defendant Left/ Right, Inc. (referred to as Company) and states that Dr. Klapper will appear on the television program and the Company will retain all ownership and copyrights in the program.
Of specific relevance to this case is the portion of the appearance release which states:
“I hereby agree not to sue and irrevocably and unconditionally release, waive and forever discharge Company and its past, present and future parents, subsidiaries (whether or not wholly-owned), affiliates, divisions, agents, representatives, employees, successors and assigns, jointly and individually (hereinafter collectively referred to as ‘Releasees’), from any and all manner of liabilities, claims and demands of any kind or nature, whatsoever, in law or equity, whether known or unknown which I or my assigns, agents and/or representative ever had, now has, or in the future may have against the Releasees, including, but not limited to claims arising out of or related to the uses described herein, the Event, the Programming, my participation and/or my decision to perform the Event.” (See appearance release, annexed to motion to dismiss as exhibit 4.)
Furthermore, the appearance release also states that the producers may use Dr. Klapper’s appearance on the program “for advertising, publicity, marketing, promotional and commercial tie-in purposes.”
In deciding whether the appearance release should serve to prohibit the instant claim for defamation, the court must look to the case law interpreting releases and limitations of liability. On the one hand, parties are free to enter into contractual agreements which limit liability and such agreements will be binding upon the parties provided the language is sufficiently clear and unambiguous (see Ciofalo v Vic Tanney Gyms, 10 NY2d *407 294 [1961]; Obremski v Image Bank, Inc., 30 AD3d 1141 [1st Dept 2006]; Lee v Boro Realty, LLC, 39 AD3d 715 [2d Dept 2007]; Kaminsky v Gamache, 298 AD2d 361 [2d Dept 2002]).
A release which seeks to limit a party’s liability must be absolutely clear that such was the understanding of the parties (see Willard Van Dyke Prods. v Eastman Kodak Co., 12 NY2d 301 [1963]; Howard v Handler Bros. & Winell, Inc., 279 App Div 72 [1st Dept 1951]).
There is a long and consistent line of cases which stand for the proposition that attempts to limit a party’s own negligence will be strictly construed and looked upon with disfavor (see Gross v Sweet, 49 NY2d 102 [1979]; Boll v Sharp & Dohme, Inc., 281 App Div 568 [1st Dept 1953]).
Many of the cases which have found exculpatory clauses to be inapplicable have involved parties seeking to insulate themselves from negligence which results in some form of bodily injury (see Gross v Sweet, 49 NY2d 102 [1979] [negligence involving parachute jumping]; Abramowitz v New York Univ. Dental Ctr., 110 AD2d 343 [2d Dept 1985] [negligence related to dental procedure]; Boll v Sharp & Dohme, Inc., 281 App Div 568 [1953] [negligence in collecting of blood donation]; Colton v New York Hosp., 98 Misc 2d 957 [Sup Ct, NY County 1979] [malpractice alleged from kidney transplant]).
This case certainly does not involve a release given in a situation which requires a higher level of scrutiny due to a special relationship between the parties (see Ciofalo v Vic Tanney Gyms, 10 NY2d at 297). The nature of the appearance release is straightforward and simply intended to prohibit lawsuits arising from the appearance of a participant in a reality television show. There is no special relationship between Dr. Klapper and the producers of Mob Wives. No bodily injury is alleged and there is no claim that plaintiff was coerced or fraudulently induced to sign the appearance release.
The closest parallel cases that this court can point to would be the few decisions involving movie and television productions in which the participants have sued alleging that they were misled or fraudulently induced into appearing in the production. In those cases the existence of a release signed by the participant has been found to bar the lawsuit (see Psenicska v Twentieth Century Fox Film Corp., 2008 WL 4185752, 2008 US Dist LEXIS 69214 [SD NY, Sept. 3, 2008, Nos. 07 Civ. 10972(LAP), 08 Civ. 157KLAP), 08 Civ. 1828CLAP)]; Weil v Johnson, 2002 NY Slip Op 50513[U] [Sup Ct, NY County 2002]). The existence of a *408 release has also been found to bar a subsequent suit by a participant in a game show who contested the outcome of the contest (see Gelbman v Valleycrest Prods., 189 Misc 2d 403 [Sup Ct, NY County 2001]).
The particular nature of a reality television program is that the participant subjects himself or herself to the “reality” of the real life events. The “story line” may be unscripted with the exchanges extemporaneous and it is generally accepted that the behavior may be outlandish or provocative. The medical professional who agrees to participate in such a program does so with a certain amount of risk. While the potential benefit may be a boost in the doctor’s business from the exposure to the viewing audience, the risk is that he or she may be criticized or second-guessed and portrayed in an unflattering manner.
In the instant case the appearance release is not ambiguous or the product of mistake or duress. Dr. Klapper signed on to participate in a television show and took the risk of what may transpire. To a certain extent he bargained for the chance for publicity with the possibility that the outcome may not be as he expected. It has been held that
“[a] release may not be treated lightly. ‘It is a jurai act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands.’ ” (Touloumis v Chalem, 156 AD2d 230, 231-232 [1st Dept 1989], quoting Mangini v McClurg, 24 NY2d 556, 563 [1969].)
The plaintiff poses a technical challenge to the appearance release which the court finds to be without merit. While plaintiff must acknowledge that the release specifically names Left/Right, Inc., the plaintiff argues that the other corporate defendants are not so protected. However, based on the documentary evidence submitted in support of the motion, the defendants have shown that all the corporate defendants are either affiliates, assignees or designees of Left/Right, Inc. and thereby entitled to the protection of the appearance release. It is abundantly clear that the corporate defendants are closely intertwined in the *409 production of Mob Wives. A production services agreement exists which obligates Left/Right, Inc. to perform day-to-day production duties for The Weinstein Company (TWC) and Electus. The “authorship” of Mob Wives was transferred to TWC and Electus making those defendants “assignees” of Left/Right, Inc. TWC and Electus have assigned joint ownership of their Mob Wives rights to a division of defendant Viacom. By that agreement, Viacom entities Viacom Media Networks and VH1 may air the production on television. JustJenn Productions and Marvin Peart are executive producers of the show by agreement with TWC, and as such, would be “affiliates” and covered by the appearance release (copies of the applicable agreements are annexed as exhibits A, B and C to the supplemental off of Elizabeth McNamara in support of the motion).
It is also impossible to recognize an actionable claim for tortious interference with existing contracts or business relations (plaintiffs first cause of action) or a claim for tortious interference with prospective business relationships and economic advantage (plaintiffs second cause of action). These causes of action require that there be evidence that the defendants interfered with a specific contract or business relationship (see Business Networks of N.Y. v Complete Network Solutions, 265 AD2d 194 [1st Dept 1999]; Korn v Princz, 226 AD2d 278 [1996]).
For plaintiff to succeed on a tortious interference claim there would have to be an existing enforceable contract and deliberate interference by the defendants that resulted in a breach of that contract. (Carvel Corp. v Noonan, 3 NY3d 182 [2004].) Simply stated, there is only speculative and conclusory statements by the plaintiff to support a claim for interference with a contract or prospective business relations.
Conclusion
Based on the documentary evidence provided in this motion, the corporate defendants have met their burden to submit evidence that resolves all factual issues as a matter of law. (Mazur Bros. Realty, LLC v State of New York, 59 AD3d 401 [2d Dept 2009]; Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314 [2002].) Even accepting the allegations of the plaintiff as true, as this court must in a CPLR 3211 motion, and assuming every possible inference in favor of the plaintiff, the court cannot conclude that these allegations against the corporate defendants can fit within any cognizable legal theory (see Leon v Martinez, 84 NY2d 83 [1994]; Morone v Morone, 50 NY2d 481 [1980]).
*410 There is no evidence in this case that the corporate defendants engaged in an intentional or malicious campaign to discredit or defame Dr. Klapper. There is no indication that they acted to deliberately injure Dr. Klapper or to destroy his professional practice. The acts of the corporate defendants involve the publicity and advertising for the show and using portions of the show to promote Mob Wives. Despite the contentions of plaintiffs counsel to the contrary, the advertising and promotion aspects of this production are unequivocally addressed in the appearance release. The actions in promoting Mob Wives through advertising and publicity must be reasonably expected by Dr. Klapper or any other participant who signs a release. To determine the intentions of parties to an exculpatory agreement the court must look to the “reasonable expectation and purpose of the ordinary business [person] when making an ordinary business contract [which] serve as the guideposts to determine intent.” (Uribe v Merchants Bank of N.Y., 91 NY2d 336, 341 [1998] [internal quotation marks omitted].) By this measure, Dr. Klapper cannot claim that he had no idea that the Mob Wives show was intended to be aired on television and that it would be promoted and publicized. Accordingly, it is disingenuous to claim that the appearance release is violated by the corporate defendants’ actions which are integral to the production and promotion of the program.
The existence of the appearance release is not in dispute and such release serves to insulate the named party (Left/Right, Inc.) as well as the corporate affiliates and assigns who play a role in producing Mob Wives. The terms of the release are clear and explicit and there is no public policy that requires this court to set aside the release as unfair. The contract entered into by Dr. Klapper was understood and the risks were apparent and obvious.
Finally, the appearance release provides that the releasor (Dr. Klapper) shall be responsible for “any attorneys’ fees incurred by Company in connection with any claim or lawsuit brought in violation of this agreement” (exhibit 4 annexed to McNamara off). The language of the provision is explicit and understandable. The decision to bring the instant lawsuit triggers the provision to pay the reasonable legal fees of the corporate defendants in defending this action and Dr. Klapper is bound by the terms of the agreement he signed (see Borg v Belair Ridge Dev. Corp., 270 AD2d 377 [2d Dept 2000]). A hearing to determine appropriate legal fees shall be scheduled 30 days after entry of a settled order in this matter.
*411 For the reasons set forth herein, the plaintiffs summons and complaint are dismissed.

. The amended complaint dated September 13, 2012 alleges that defamatory remarks were made by Ms. Graziano to Popeater (June 28, 2011); OK Magazine (July 15, 2011); Huffington Post (Jan. 3, 2012); Hollywood Life.com (Jan. 3, 2012); VH1 biog (Jan. 5, 2012); and AndersonCooper.com (Jan. 18, 2013). Ms. Graziano is alleged to have made false statements on television appearances, including Good Morning America (Jan. 5, 2012); Anderson Cooper 360 (Jan. 18, 2012); FoxLa (Mar. 20, 2012); and The View (Apr. 12, 2012). Allegedly false statements were made on radio on Power 105.1 (Jan. 9, 2012).

. This writer has (intentionally) not viewed the Mob Wives episodes at issue to avoid any potential prejudice that might result.